Good morning. May it please the Court, my name is Dan Goldberg and I represent Albert Roberts in this appeal. The District Court erred in denying Mr. Roberts' motion for judgment and acquittal because the government presented insufficient evidence to sustain a conviction on the substantive wire fraud counts, that's counts 2, 3, 4, and 5 of the any omission by Mr. Roberts on his loan applications were material to the lender's decisions to extend the loans in question here, or that such omissions or mistakes were intended to defraud. Pursuant to 18 U.S.C. section 1343, to prove wire fraud, the government had to prove four elements. One, an intent to defraud. Two, a participation in a scheme to defraud. Three, the use of a wire in furtherance of the fraud. And of course, fourth, that the false or fraudulent misrepresentation was material. Several circuit courts throughout the nation have entered opinions concluding that a motion for judgment and acquittal was appropriate in a wire fraud conviction, notwithstanding the jury's verdict. We set those cases in our brief, but I think perhaps the most compelling case was the Weimar case from the Seventh Circuit and in reversing and finding the motion for judgment and acquittal, the Seventh Circuit noted that the government, quote, stretches the reach of wire fraud statutes far beyond where they should go, and at times, quote, expansive losses in the mail and wire fraud statutes have led to the liberal use by federal prosecutors. So here Mr. Roberts was acquitted of the conspiracy account. That was count one under 18 U.S.C. section 1349. He was convicted of the substantive wire fraud counts, but to understand why the evidence was insufficient, I think we need to look at the conspiracy theory briefly. Mr. Roberts purchased 12 homes from Gary Penrod in the years of 2006 and 2007. In purchasing those homes, he of course got third-party lending, and in doing so, he filled out a number of applications to get those loans. The government's overarching theory was that because of those omissions and mistakes, he somehow induced the lenders to make loans they otherwise would not have. The problem at trial, though, I think, was that that theory just wasn't supported by the evidence, and I think the key, one of the key factors, at least, was that Mr. Roberts was extremely forthright about the huge amount of debt he was in, over $5 million worth of debt he was disclosing to the lenders. And it wasn't just normal debt, it was toxic debt, that he was hemorrhaging money. He was losing over $7,000 a month, or $86,000 a year on these investment properties. And the government doesn't dispute those figures. Didn't the lenders testify that, had they known about the omitted information, they wouldn't have made the loan? Absolutely, Your Honor, and I think it's a great point. I think Mike Stoddard, he testified as the government's expert. And I was actually going to highlight this because I think this is a really important point. The government cites in their brief, on page 38, some of the testimony by Mr. Stoddard. And let me just read it to you briefly. The government asks Mr. Stoddard on direct examination, Mr. Stoddard, in your review of the 12 loans made by Mr. Roberts, did the lenders rely on the misrepresentations that he made? Answered yes. Were those misrepresentations material? Answered yes. And is that important? Answered yes. In other words, important, would that be the case in every loan? Answer, in every loan that had been made, if the lenders had known of misrepresentations, answer no. So that was the testimony. But I think what you have is a grave disconnect between those opinions and what the evidence really bore out. Let me turn you to Government's Exhibit 12B-12. This is an email from Terry Protzman. She was the title company closer on all these deals. And on June 11, 2007, she emailed to the lenders an urgent email. It says urgent in the subject line. And she says to the lenders, this is the fourth loan that I've closed with W. Roberts with DB Home Lending. Mr. Roberts has closed other loans within the last six months with other lenders. Two hours later, the lender emails back, I took it to our head underwriter and we're okay, thanks. So I think the reality is, pre-2008, it's just a different world. And this is before the mortgage crisis loan hit America. Was the person who sent it okay aware of the information that was emailed? Right. The significance is this. Stoddart testified, hey, if we'd known about the stacking of these loans, we wouldn't have extended any more loans. We'd known about what? The stacking of loans. So that's the industry term they use, is that when you stack loans, you're getting several loans, and that somehow Mr. Roberts wasn't disclosing that he was getting several loans. Just not true. I mean, in his applications in question in here, he's disclosing not only that he's stacking loans, but that he's losing a massive amount of money on those loans. So I think that's important here, because a key argument by the government is that had Mr. Roberts somehow more fully disclosed the loans, a light would have gone on with the lenders, and they would have refused those loans. It's just not borne out by the evidence, I don't think. What were the other non-disclosures alleged of him stacking? Right. There's some payments from the sellers that were allegedly found to be withheld. Right, that were made after closing. Absolutely. And the government proved that. I think the key factor with that is a couple things. First... I'm not sure I understand. The point there was that because the seller paid back after closing, the loan was, there was effectively no down payment. Is that what happened? So it was 100% financed rather than partially financed? Correct, I think that was the government's theory. So why isn't that sufficient to show? Well, I think a number of things. First, the payment there, it's indisputed, was not inherently illegal, right? The government doesn't dispute that in their brief, that had they disclosed that information on the HUD form, perfectly legal transaction. The bank wants to lend under those circumstances. Right, right. The other important factor here is that... Why is that important? I don't understand why that's important. Well, I think they called a... They're making it inherently illegal loan when they charged him with false applications. Right, Your Honor. I think it's important because when you hear the term kitback, you think you're giving it to a government person and I'm trying to bribe that person. That's not the case here. This is a transaction that could have been lawfully done, right? In theory at least. But there's other factors I think that's important here. Mr. Roberts is the purchaser of the property here. The seller, Penrod, he's the one making these payments after closing. That's the undisputed evidence. He's deciding when the payments are going to be made, how much money is going to be made. And we can't forget Mr. Penrod... What about Roberts disclosing the price that he's paying for the house when he's got this sad deal that that could change depending on what the amount of loan is? He didn't disclose it. That might not be the real purchase price. It may be something different. Well, and I think that's a great point. As far as it pertains to the purchase price, again, I think the evidence was that the parties, of course, agreed to a purchase price, right? In the sales contract. On a couple of occasions, when the third party appraiser came in to appraise the property, they said, hey, this property is not worth that much. It's worth less. Guess what the parties did? They entered into a minted sales contract to reflect the wishes of the lender. So it's not the situation where you have someone who's trying to pump up, artificially inflate the sales price. I think that evidence cuts in Mr. Roberts' favor. And I think there's other factors. These payments aren't being hidden from anyone. They're made via check. And on the check, on the subject line, they actually reference the property that the payment's for. And the government refers to that as significant camouflage. I'm just not seeing how it's camouflaged. Had they wanted to camouflage those payments, they would have made them via check, or, I'm sorry, via cash, or certainly not put the property address here. You didn't have access to those chats, did you? I'm sorry, I just didn't hear you. Did any of the lenders have access to those chats? Of the ones that are made after closing, no. Absolutely not. So the fact that they wrote chats rather than exchanging cash doesn't mean anything, does it? Right. Right. I'm just saying if you're trying to show, what the government's trying to show is that there's an intent to fraud, and the fact that they're being pretty, you know, if I'm thinking I'm committing a crime, I'm going to do a better job of that. You know, trying to camouflage it, I would think. They weren't very good at the crime they were committing. Not exactly, Your Honor. I mean, I think, the other point is Diane Hastings, right? She's the one that's filling out all these loan document applications. That doesn't exonerate my client from doing it truthfully and honestly. Absolutely. I'm not saying that. But it does evidence the fact that, and she testified to this, my client never went up to her and said, this is how we're going to do it. This is the untruthful information we're going to put on it. It just didn't happen there. And I think a key point is that being a bad businessman doesn't make you a criminal. Right? Here, we have to remember, this is before the mortgage crisis bubble popped, and a lot of people were over in their neck in toxic debt. But failing to make your mortgage payments doesn't make you a criminal here. And did Mr. Roberts make mistakes? Absolutely. Did he admit things? No doubt about it. But I think the government focuses on untruthful information. So these aren't sham applications here. So I think that's important here. I think that the mere non-disclosure of information is insufficient to prove wire fraud. I mean, we cite to the Stax case for that proposition. That's an Eighth Circuit case. And in that case... Right. But I think it's an important... I don't see that that's a distinction of difference. And let me tell you why. Well, I think it's this court evaluating the government's evidence and finding that there's a major problem with it. And the problem is this. Here you have a similar situation where the businessman is trying to get a loan. And he didn't disclose certain other loans he took out, that he was $900,000 in debt, and that his lenders were threatening to stop shipment. This court said, you know, that's a problem for the government's case. And I think it's a similar case here. The government focuses on other flaws in Mr. Roberts' lending information. For example, that he didn't disclose that he was going to live in some of the... He said he was going to live in some of them, and that that was a material misrepresentation. But in the bulk of them, he put the truthful information, and they still extended the loan. So I think the materiality is what's lacking here. For all these reasons, we respectfully submit that this matter should be reversed. There's a sentencing issue that we're going to stand on our briefs on. And I'm going to reserve the remainder of my time for rebuttal. Thank you. Good morning, Your Honors. I think the key here, as we've talked, is that in this case, there is sufficient evidence to find a verdict in this case. There's sufficient evidence just on the point alone of the checks that were paid outside of closing. That alone is enough and material enough to warrant a verdict in this case based on the schemes involved. And I think the critical thing here is to think in terms of the scheme. And the instruction that was given, Instruction 22, says, A scheme to fraud need not be fraudulent on its face, but must include some sort of fraudulent misrepresentation or promise reasonably calculated to deceive a reasonable person. And I think that's the crux of this. Any fraud case has some sheen of reliability, of reality to it. But in this case, under that are these payments, these payments made outside of closing. And these payments in and of themselves could have been legal if disclosed, but were not. And the word camouflage was used because in a fraud case, oftentimes, an individual or entity will camouflage what they're doing. And in this case, using the checks and using the statements on the checks that they were consulting or consulting fees gives it some sheen of reality. And so in that case, that alone is enough to warrant the verdicts in this case, to establish a scheme over these 12 homes that something was going on, and the jury saw that, and the jury made that distinction. But beyond the checks, and there was a significant number of checks, totaling on the 12 homes about $800,000 that was paid to Mr. Roberts in this case. Beyond that, there was many more points, as you've seen, on the applications. And that includes whether they were living in the homes, what the income was, many other things like that, that the experts said were material. And they would have, if they had known these facts, likely not have given the loans in these cases. Did any of the actual lenders testify? No, we had actually three people kind of touched on that point. One was for SunTrust, which was an individual that represented the banking entity, SunTrust, for one of the two homes that was involved, or it may have been both of the two homes involved. And he testified in that case that it was material, and that they would have had a problem with those loans had they known about the circumstances of the loans and the payback. But besides him, again, we had the expert. And then besides him, we had an individual that was cooperating in the case that had pled guilty, had gone to jail for the mortgage fraud, and also talked about his understanding of the mortgage fraud industry. He was a realtor investor in mortgage activity, and he indicated that that was material as well. So it was not just one person, the expert. It was one of the loan officers or one of the people associated with the bank. What was the name of the last person you mentioned? Mr. Armstrong, Garren Armstrong, was the cooperator. He was a mortgage broker who had pled guilty in another matter and testified in this case as a cooperating witness. He was involved with Mr. Penrod and another defendant, Mr. Brown, in a similar type of situation, in a similar type of circumstances. And he as well received kickback checks, and associated with Mr. Brown in this case. It was a similar plan and scheme that Mr. Penrod was involved with, Mr. Brown, very similar in its nature and course, and so it had that relevancy. It showed, he showed that there was an understanding of what was going on in the kickbacks, in the fraudulent scheme, very similar in nature. It's hard to imagine he can, not knowing all the details of these loans, being speculative. Oh, I'm sorry. I understand. Yeah, well, as I mentioned, the SunTrust lender was one of the individuals involved. But we had other people testify about that as well. I don't know if that answers your question sufficiently, but that's the evidence that was presented at trial. Well, the lenders, his background was in the mortgage business, and he had done a lot of work in that area, had reviewed a lot of loans, had been involved in a lot of loan activities, and he was familiar with the different elements that are necessary to make a quality loan, and a decision to make a quality loan. And the key to that is a lot of these other elements, but the one thing that's kind of irrefutable is these kickback checks, these kickback checks coming after the fact, and that in and of itself is enough to push this thing over the top, I think, and get the verdict in this case. So in regards to the sufficiency of... The kickback came from the seller. Right, exactly. And the way that worked is usually after the sale, shortly after the sale, a check was written, and in some cases would cover both the closing costs and the down payment, and then might often have an additional amount over and above that as a payment, like a payment to buy my home, basically, that encouraged the individual to purchase the home. And in this case, that's what Mr. Roberts did. And there was a couple of other people that, like Mr. Roberts, had done the same thing, that had received kickback checks as well that received that and had testified in this case. Penrod was charged in a subsequent case. That case went to trial. He was found not guilty in that case. Was there a loan closer in this case who pled guilty? There was a loan closer who testified in this case, but she did not plead guilty to this matter. So she was not aware of the kickback checks after the fact. No one other than Mr. Penrod and Ms. Hastings, who was the realtor who did plead guilty and then pled guilty in this matter, were aware of the kickback checks. So it was Mr. Penrod, Mr. Roberts, and Ms. Hastings who were involved. What did the experts say about behind these so-called kickbacks? Well, I think to your point earlier was that in this case there was no money down by the individual purchasing the home. So there was no risk involved. So the individual that's purchasing the home, the bank's not aware that they're having any risk involved. They want the individual that's putting the money down to have some risk so they'll stay with the home. In this case, as it goes forward, in almost every case, Mr. Roberts defaulted on the homes. Well, he defaulted because he had no interest in the home. He had no risk in the home. In almost every case on the Penrod homes, he had not put any money down. So he had no risk. And that's why the lender wants to know that. They want to know the person's going to invest and stay with that home. Did those homes go into default shortly after they were closed? I don't know exactly. It was fairly shortly after. In fact, some of the homes were, he stopped actually paying mortgages on some of the homes as he was purchasing other homes. But at the end of the day, I believe of the 12 homes, 11 went into default, yes. So what was the theory of the case against Penrod? How did he benefit from being kicked out? He was able then, in his case, in that case, he was able to sell the homes faster. He did not have to market the home. He did not have to list the home. And he could sell the home quicker and turn it over faster so that he didn't have to have as much money involved in the home throughout the process. What was he charged with? I believe he was charged with conspiracy as well. But it may have been just false statements. I can't remember exactly off the top of my head. But in that case, there was multiple other homes besides the ones that were involved, Mr. Roberts, in this case. So as far as the evidence the government's concerned has presented, we believe that there's sufficient evidence to support the scheme, to support the convictions without the conspiracy charge in this case. And we've presented that sufficient evidence. And on the other points, I think I will leave that to the briefs as well. I don't have anything further to say on that. Thank you. Thank you, Your Honor. I think another important factor that we haven't been able to touch on really is that he was acquitted of the overarching conspiracy theory. If you take a look at the indictment, I think it's a 25-page indictment. And that's 24 pages of that indictment. And I think that needs to be given meaning, that acquittal of the overarching conspiracy theory. The government kind of pooh-poohs that notion. But I think it's important specifically when you were talking to him about the evidence, a lot of this evidence came in, in my view, as hindsight vision. I think all the witnesses that testified were not actually there extending the loans at the time of 2006, 2007. So it's easy to look back and say, oh, no, no, we wouldn't have done it that way. But I think they lose credibility when they say, well, had we known the true extent of the debt, we did. It says on those documents it was $5 million. You knew that it was losing $84,000 a year. And that... Fair enough, Your Honor. I mean, I think that's always inherently a part of these cases in looking at a motion for judgment of acquittals. And I think there was some cross-examination. But I get your point. I mean, I think it's a fair point. But I think at the same time, you see fraudulent documents where there's a hoax. And there was a lot of evidence of this, where every fact put on these documents is fraudulent. That's not the case here. Mr. Roberts disclosed that he was a teacher, disclosed his debt, disclosed the bulk of his assets. And for all those reasons, we respectfully submit that a motion for judgment of acquittal is appropriate. Thank you. Very well. Thank you both for your arguments. Case is submitted. Court is adjourned.